UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

FRONTLINE POWER SOLUTIONS, LLC and
JOHN T. HOLMES

Plaintiffs,

v.

JAY SNYDER and
FAIR VIEW ENERGY, INC.,

Defendants

CIVIL ACTION NO.
(Jury Trial Requested)

## **COMPLAINT**

Plaintiff, Frontline Power Solutions, Inc., and its Chief Executive Officer, John T. Holmes, bring this action against its former trusted Senior Vice President of Sales and Director of Business Development Jay Snyder, and his competing company, Fairview Energy, Inc., to recover damages suffered as a result of Defendants' breaches of fiduciary duty and duty of loyalty, tortious interference with existing and prospective business relationships, and breach of contract.

### PARTIES

1.      Plaintiff Frontline Power Solutions, LLC, ("Frontline Power") is a Rhode Island limited liability corporation with its principal place of business located at 400 Metacom Avenue, Bristol, Rhode Island.

2.      Plaintiff John T. Holmes resides in and is a citizen of the state of Rhode Island.

3.      Defendant Jay Snyder, on information and belief, resides in and is a citizen of the state of Pennsylvania.  On information and belief, Jay Snyder is a co-owner (with his wife, Amy Snyder) of co-Defendant Fair View Energy, Inc.

1

4.      According to the Pennsylvania Secretary of State's web site, Defendant Fair

View Energy, Inc. ("Fair View Energy") is a Pennsylvania corporation with its principal place

of business located at 7782 West Ridge Road, Fairview, Pennsylvania 16415.  *See*

*https://www.corporations.pa.gov/Search/CorpSearch* (last visited Sept. 29, 2015).

JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.

§ 1332, because complete diversity of citizenship exists between Plaintiffs and the Defendants,

and the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and

costs.

6.      This Court has personal jurisdiction over the Defendants because, as alleged

herein, each of the Defendants has minimum contacts with and has availed themselves of the

state of Rhode Island sufficient to establish this Court's long-arm jurisdiction over each

Defendant.

7.      Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Frontline

Power is a Rhode Island corporation with its principal place of business in Rhode Island and a

substantial part of the events or omissions giving rise to the claims described herein occurred in

Rhode Island.

FACTS

8.      Plaintiff Frontline Power is a comprehensive energy solutions company

comprised of a collective of energy industry experts specializing in energy procurement, sales,

marketing, analysis, and information technology.  Frontline Power provides its customers with

full service power supply solutions, including supply, billing, auditing, renewable energy

supply and consulting, efficiency consulting, and incentive coordination for large and small

2

enterprises. Frontline Power's innovative approach and its positioning with top energy producers also affords it the ability to leverage pricing and provide its customers with substantial energy savings.

9.      Frontline Power was formed in February 2013. It serves customers in 18 states with a deregulated energy market, including, but not limited to, Rhode Island, Massachusetts, New Hampshire, Maine, New York, New Jersey, Pennsylvania, Texas, California, Maryland, Ohio and the District of Columbia.

10.     Frontline Power is a hybrid in the energy industry. Frontline Power is partnered with Verde Energy, a licensed energy supplier that allows Frontline Power to offer supplier services to its clients. Frontline Power also acts as a broker working with more than 30 different energy suppliers across the country. By having so many pricing options, it gives its sales people the best possible chance to close business as they have access to every pricing option available on the market.

11.     Frontline Power employs 4 individuals in Rhode Island, and it has a total of 58 independent sales agents nationally.

12.     In the short time since its inception, Frontline Power has been extremely successful. In 2014, Frontline Power reported approximately $5 million in gross revenues.

13.     The lifeblood of Frontline Power's business success is its ability to attract and, importantly, to retain customers and sales agents in the various markets where Frontline Power operates. To accomplish this, Frontline Power entrusts its team of salespeople to market Frontline Power's services to potential customers in the markets where Frontline Power operates, and to maintain strong relationships with its existing customers.

14.     Frontline Power's excellent reputation in the energy services marketplace is also

essential to its success. Frontline Power has worked hard since its inception to develop a

reputation as an honest and reliable provider of energy services. As a result, prior to the events

described herein, Frontline Power enjoyed a hard-earned reputation as an honest, reliable

energy services company dedicated to providing its customers with outstanding value.

15.     In or around February of 2013, Frontline Power hired Mr. Snyder as an

independent sales agent. Initially, Mr. Snyder held the position of Director of Business

Development. Mr. Snyder traveled to Frontline Power's Rhode Island office to attend sales

training and recruiting meetings, and attend general business strategy sessions. Mr. Snyder also

participated in conducting sales and training seminars to prospective and new sales agents in

Rhode Island. In or around March 2013, Frontline Power required Mr. Snyder to execute an

independent agent agreement ("Agent Agreement"), which contained restrictive covenants

limiting Mr. Snyder's ability to solicit, directly or indirectly, Frontline Power's customers,

agents, sub-agents, or other affiliates to leave Frontline Power during the period of the agency

relationship and for a period of 12 months after its termination, and which also prohibited Mr.

Snyder from disclosing confidential and proprietary information of Frontline Power and its

customers. The Agent Agreement provided, among other things, that:

a)  "[F]or a period of twelve (12) months immediately following the termination of this
    relationship with Frontline Power Solutions for any reason, whether with or without
    cause, Agent shall not either directly or indirectly solicit, induce, or encourage any of
    Frontline Power Solutions['] active customers to leave their Frontline Power
    Solutions Service, either for Agent or for any other person or entity," and

b)  "For a period beginning with the signing of this Agreement and for a period of twelve
    (12) months immediately following the termination of this relationship for any
    reason, whether with or without cause, Agent shall not either directly or indirectly
    solicit, induce, recruit or encourage any of Frontline Power Solutions['] employees,
    Agents, Sub-Agents, Licensees, or Affinity Partners to leave their employment, or
    attempt to solicit, induce, recruit, encourage or take away employees, Agents, Sub-
    Agents, Licensees, Affinity Partners, either for itself or for any other person or entity
    for any purpose whatsoever."

4

c) "Agent agrees at all times during the term of his engagement by Frontline Power Solutions and thereafter, to hold in strictest confidence, and not to use, except for the benefit of Frontline Power Solutions, or to disclose to any person, firm or corporation except for the benefit of Frontline Power Solutions and with written authorization of an authorized officer of Frontline Power Solutions, any Confidential Information of Frontline Power Solutions. Agent understands that 'Confidential Information' means any Frontline Power Solutions proprietary information, financial data, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, customer lists and customers (including, but not limited to, customers of Frontline Power Solutions on whom Agent called or with whom Agent became acquainted during the term of his Agent status by Frontline Power Solutions), markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information disclosed to the Agent by Frontline Power Solutions either directly or indirectly in writing, orally or by drawings or observation of parts or equipment."

16. In August of 2014, Frontline Power hired Mr. Snyder as its employee. Mr. Snyder worked as a salesperson responsible for the western Pennsylvania region. Frontline Power assigned him to the position of Senior Vice President of Sales. Mr. Snyder submitted his hiring paperwork, such as his Form W-4 and his Form I-9 Employment Eligibility Verification, to Frontline Power's Rhode Island office. Mr. Snyder submitted direct deposit paperwork through Frontline Power's Rhode Island office, through which he authorized Frontline Power to deposit portions of his employment and agency earnings into a checking account maintained by Fair View Energy. The direct deposit transfers took place through financial institutions located in Rhode Island.

17. Upon hiring Mr. Snyder, Frontline Power explained to him Frontline Power's business model and trade secrets, which have resulted in Frontline Power's success. Frontline Power also entrusted Mr. Snyder with its list of existing customers and sales agents in Mr. Snyder's region. Frontline Power provided this information to Mr. Snyder in confidence and with the understanding that Mr. Snyder, as a trusted Frontline Power executive level employee, would not use the information to Frontline Power's detriment and would instead use it solely to

5

help successfully market Frontline Power's services and to help maintain and expand then-existing customer, supplier, and other business relationships.

18.     With Frontline Power's trust and assistance, Mr. Snyder enjoyed a successful career as a Frontline Power executive and salesperson. Using the information and training provided by Frontline Power, Mr. Snyder, with the direction of upper management, was given independent direct sales agents to manage, and he developed relationships with both new and existing Frontline Power customers. Most of these relationships were assigned to Mr. Snyder by Frontline Power's upper management. Mr. Snyder also developed his own customer relationships during this time using Frontline Power's training, confidential information, and other resources.

19.     As a result of his initial success, in or around August 2014, Mr. Holmes offered Mr. Snyder a Warrant authorizing him to be given a substantial share of Frontline Power ownership in connection with the execution of a confidentiality, non-competition and non-solicitation agreement. These agreement documents were sent to Mr. Snyder from Frontline Power's Rhode Island office, but he never executed said documents. In or around February 2015, Mr. Holmes offered Mr. Snyder another substantial ownership share in Frontline Power, which he never accepted.

20.     While Mr. Snyder worked for Frontline Power as an employee and agent, he routinely engaged in systematic contacts with and availed himself of the state of Rhode Island. During that time, Mr. Snyder communicated with other Frontline Power executives and management in Rhode Island on an almost-daily basis, both by telephone and electronic mail, and he had multiple conversations with one of Frontline Power's investors in Rhode Island. Mr. Snyder traveled to Frontline Power's Rhode Island office to attend and conduct sales

trainings and recruiting meetings, and to attend general business strategy sessions, and he conducted sales trainings in Rhode Island and other New England markets using sales presentation materials created at Frontline Power's Rhode Island office. Mr. Snyder sent to Frontline Power's Rhode Island offices every contract for services (except one) entered into by a customer signed up by Mr. Snyder. Mr. Snyder and his sales team used a Rhode Island based energy supplier, from which he derived commissions. All of Mr. Snyder's paychecks for his salary and for commissions were generated in Rhode Island, and Mr. Snyder directed Frontline Power to deposit a portion of those funds each pay period from a Rhode Island financial institution into a checking account maintained by Fair View Energy. Mr. Snyder also traveled to Rhode Island multiple times per year to meet with other Frontline Power executives and management and, in at least one instance, he traveled from Rhode Island to Connecticut for a meeting with Frontline Power's outside investor.

21.     Fair View Energy similarly engaged in systematic contacts with and availed itself of the State of Rhode Island. All of Mr. Snyder's paychecks for his salary and for commissions which were generated in Rhode Island, and a portion of those funds were direct deposited from a Rhode Island financial institution into a checking account maintained by Fair View Energy. Fair View Energy also formed a verbal agreement with Frontline Power in Rhode Island, whereby Fair View Energy would collect funds from sales generated in Ohio, through a third-party broker, and transfer brokerage fees to Frontline Power in Rhode Island. Frontline Power would then deposit those brokerage fees in Rhode Island and use those funds to pay commission checks to Mr. Snyder and other commissioned sales people responsible for the initial sales.

22.     Although Mr. Snyder achieved some initial sales success while employed by

Frontline Power, he also abused his senior position and engaged in wrongful conduct that

benefitted Mr. Snyder and his company, Fair View Energy, and damaged Frontline Power.  As

Senior Vice President of Sales and Director of Business Development, Mr. Snyder had access

to and the ability to manipulate the information in all contracts and other forms provided to

Frontline Power's Rhode Island offices for business in Pennsylvania and Ohio, all of which

were provided to Mr. Snyder to review and send to Frontline Power's Rhode Island offices.

Mr. Snyder abused that authority to Frontline Power's detriment by, among other things:

a.  Routinely inputting inaccurate information on Frontline Power contract submission forms, agent agreements, supplier information forms (including booking, enrollment, and margin confirmations, and commission reporting). Mr. Snyder routinely provided inaccurate margins, terms, start dates, and general customer contact information.

b.  Failing to follow Frontline Power corporate policies in setting margin splits by inputting extra margins on submission forms that resulted in Mr. Snyder receiving commissions to which he was not entitled. Mr. Snyder acted solely in establishing over 110 different commission structures where company policy allowed 4 or 5 percentage split possibilities.

c.  Adding his name for margin overrides to contract submission forms for business generated by sales representatives working under Mr. Snyder for business that Mr. Snyder had no significant role in generating, in violation of Frontline Power policy.

d.  Engaging two third-party brokers which Mr. Snyder managed through his own company, Defendant Fair View Energy.  Accounts procured by these third-party brokers routinely failed to timely pay Frontline Power for services provided or, in some instances, failed to pay at all.  Frontline Power discovered, through a review of Mr. Snyder's Frontline Power email account, that at least one of the third-party vendors and/or Mr. Snyder manipulated commission reports such that several accounts procured with the third-party vendor never paid Frontline Power over a two-year period. When Frontline Power asked Mr. Snyder on multiple occasions to investigate these issues, he failed to do so.  And when Frontline Power asked Mr. Snyder for his contacts at the third-party vendor, he refused to provide the contact information and insisted on handling the issue himself, which he then failed to do.  He also consistently kept submitting business to these third-party brokers after being specifically instructed not to.

e.  Persistently refusing to abide by Frontline Power's corporate policies and

procedures, or to undertake training repeatedly offered by Frontline Power to familiarize Mr. Snyder with these policies and procedures, including Mr. Snyder's refusal to utilize Frontline Power's streamlined single entry system for all leads, deal management, and contract submission. Mr. Snyder further refused Frontline Power's requests that Mr. Snyder direct other sales representatives working under him to follow these corporate policies and procedures.

f.   Refusing to provide corporate and supplier contact and supplier procedure information to Frontline Power's corporate office in Rhode Island to better the customer relationship management system.

g.   Refusing to carry out other job duties and responsibilities, including refusing to recruit, hire, train, and motivate Frontline Power sales representatives.

h.   Insisting that Frontline Power hire and pay Mr. Snyder's wife, Amy Snyder, ostensibly to assist Mr. Snyder with pricing and sending deals to suppliers so that Mr. Snyder could recruit and train new salespeople (which he failed to do). When Frontline Power employees would attempt to contact Ms. Snyder, however, she repeatedly failed to provide timely responses and instead would let days pass before responding.

i.   On information and belief, consistently conducting business with customers, agents and corporate while under the influence of alcohol.

23.   Incredibly, despite being one of the highest-paid employees of Frontline Power, on information and belief, Mr. Snyder, beginning sometime after he became an employee in late 2014, undertook a scheme to syphon Frontline Power customers and sales agents away from Frontline Power and to Mr. Snyder's own company, Defendant Fair View Energy. Mr. Snyder accomplished this scheme by, among other things, tarnishing Frontline Power's reputation by making false and slanderous statements about Frontline Power and its CEO, Mr. Holmes, to its customers, suppliers, and its best salespeople; soliciting Frontline Power's customers to cease doing business with Frontline Power and to instead contract with Fair View Energy; and by actively recruiting Frontline Power's best salespeople to leave Frontline Power and instead join Fair View Energy. Mr. Snyder did all of this while he was employed as Frontline Power's Senior Vice President of Sales and Director of Business Development and

while he was bound by the restrictive covenants contained within the Agent Agreement, and he did so without Frontline Power's knowledge or consent.

24.     On information and belief, during the period of January 2015 until at least May 2015, Mr. Snyder told multiple Frontline Power salespeople working in the Pennsylvania region that Frontline Power had run out of money and would be unable to continue paying commissions to its salespeople.  On information and belief, Mr. Snyder during that time also told Frontline Power customers that Frontline Power was experiencing financial difficulties, and that Frontline Power and Mr. Holmes had engaged in illegal accounting and income tax-related acts.  The negative effect of these false and slanderous communications on Frontline Power's reputation was devastating to its business, particularly since they were communicated by Mr. Snyder, someone highly-placed within Frontline Power executive management and who, as a presumably loyal and trustworthy member of management, was acting in Frontline Power's best interests.  Unbeknownst to these customers and salespeople, Mr. Snyder was instead abusing Frontline Power's trust in him by seeking to recruit those customers and salespeople to Fair View Energy so that he and Fair View Energy could compete directly with Frontline Power.

25.     In addition to these statements, on information and belief Mr. Snyder during this same timeframe actively solicited existing Frontline Power customers, as well as Frontline Power's top salespeople to leave Frontline Power and join Fair View Energy.  Mr. Snyder did this while employed by Frontline Power, but he was acting in a dual role – as Senior Vice President of Sales and Director of Business Development for Frontline Power, *and* as an owner of Fair View Energy.

26.     On information and belief, during the period Mr. Snyder was bound by the

Agent Agreement, Mr. Snyder and agents of Fair View Energy, including John C. Sheerer, upon the direction of Mr. Snyder, contacted Frontline Power's suppliers to determine early termination penalties for Frontline Power's existing contractual customers, including, but not limited to, Sienna Mercato, Sienna Sulla Piazza, and Park Place Associates. Mr. Snyder and agents of Fair View Energy, including Mr. Sheerer, upon the direction of Mr. Snyder, then solicited and encouraged those customers to breach their contracts with Frontline Power and divert their business to Fair View Energy, which those entities did within days of the initial communications with the suppliers.

27.    On information and belief, Fair View Energy and its co-owner(s) knowingly participated in and approved of Mr. Snyder's scheme to wrongfully syphon Frontline Power's customers and salespeople from Frontline Power to Fair View Energy by, among other things, contacting Frontline Power's channel partner suppliers to obtain early termination fee information for current Frontline Power customers in order to resign those contracts with Fair View Energy.

28.    As a direct and proximate result of the Mr. Snyder's and Fair View Energy's wrongful conduct, a significant number of Frontline Power customers ceased doing business with Frontline Power and began doing business with Mr. Snyder and Fair View Energy. A significant number of Frontline Power's best salespeople also left Frontline Power and joined Mr. Snyder and Fair View Energy as a direct and proximate result of Defendants' wrongful actions.

29.    All conditions precedent to the bringing of this action have occurred, or have been satisfied, excused, or waived.

**COUNT I – BREACH OF FIDUCIARY DUTY AGAINST JAY SNYDER**

30.     Frontline Power and Mr. Holmes incorporate by reference the allegations in paragraphs 1 through 29 above as if fully set forth herein.

31.     Mr. Snyder, as a Frontline Power employee and as Frontline Power's Senior Vice President of Sales and Director of Business Development, owed a fiduciary duty to Frontline Power.

32.     Mr. Snyder breached his fiduciary duty to Frontline Power while he was employed by Frontline Power by engaging in the acts described above, which acts Mr. Snyder committed in bad faith and by which he intentionally sought to damage Frontline Power, solely for his own benefit and for the benefit of Fair View Energy and its co-owner(s) as well.

33.     As a direct and proximate result of Mr. Snyder's breach of fiduciary duty, Frontline Power and Mr. Holmes have suffered damages that include, but are not limited to, loss of business relationships, loss of revenues, and harm to reputation.

WHEREFORE Frontline Power and Mr. Holmes pray that the Court enter judgment against Jay Snyder for breach of fiduciary duty and award Frontline Power and Mr. Holmes their damages, to be proven at trial, pre-judgment and post-judgment interest, costs, and any further relief the Court deems just.

## COUNT II – BREACH OF THE DUTY OF LOYALTY AGAINST JAY SNYDER

34.     Frontline Power and Mr. Holmes incorporate by reference the allegations in paragraphs 1 through 33 above as if fully set forth herein.

35.     Mr. Snyder, as a Frontline Power employee and as Frontline Power's Senior Vice President of Sales and Director of Business Development, owed a duty of loyalty to Frontline Power and Mr. Holmes.

36.     Mr. Snyder breached his duty of loyalty to Frontline Power while he was employed by Frontline Power by engaging in the acts described above, which acts Mr. Snyder

committed in bad faith and by which he intentionally sought to damage Frontline Power, solely

for his own benefit and for the benefit of Fair View Energy and its co-owner(s) as well.

37.     As a direct and proximate result of Mr. Snyder's breach of his duty of loyalty,

Frontline Power and Mr. Holmes have suffered damages that include, but are not limited to,

loss of business relationships, loss of revenues, and harm to reputation.

WHEREFORE Frontline Power and Mr. Holmes pray that the Court enter judgment

against Jay Snyder for breach of the duty of loyalty and award Frontline Power and Mr.

Holmes their damages, to be proven at trial, pre-judgment and post-judgment interest, costs,

and any further relief the Court deems just.

## COUNT III – TORTIOUS INTERFERENCE WITH EXISTING CONTRACTUAL RELATIONS AGAINST JAY SNYDER AND FAIR VIEW ENERGY

38.     Frontline Power and Mr. Holmes incorporates by reference the allegations in

paragraphs 1 through 37 above as if fully set forth herein.

39.     At all times that Mr. Snyder and Fair View Energy committed the tortious acts

alleged herein, Frontline Power had existing contractual relationships with a number of

business entities, under which those entities had contracted to pay Frontline Power to provide

them with Frontline Power's energy-related services, and Mr. Snyder and Fair View Energy

knew of Frontline Power's existing contractual relationships.

40.     Mr. Snyder and Fair View Energy knowingly and intentionally interfered with

Frontline Power's existing contractual relationships with its customers by, among other things,

spreading negative false information about Frontline Power and otherwise actively soliciting

those customers to terminate their contractual relationships with Frontline Power and to

contract with Fair View Energy instead.

41.     Mr. Snyder and Fair View Energy interfered with Frontline Power's existing

contractual relationships without privilege or justification, and acted with the sole intention of damaging Frontline Power to the direct benefit of Mr. Snyder and Fair View Energy. But for the tortious actions of Mr. Snyder and Fair View Energy, Frontline Power would have maintained these beneficial existing contractual relationships with its customers.

42.     As a direct and proximate result of Mr. Snyder's and Fair View Energy's intentional interference with Frontline Power's existing contractual relations, Frontline Power lost existing customers and suffered other damages.

WHEREFORE, Frontline Power and Mr. Holmes pray that the Court enter judgment against Jay Snyder and Fair View Energy for tortious interference with existing contractual relations and award Frontline Power and Mr. Holmes their damages, to be proven at trial, pre-judgment and post-judgment interest, costs, and any further relief the Court deems just.

## COUNT IV – TORTIOUS INTERFERENCE WITH PROSPECTIVE CONTRACTUAL RELATIONS AGAINST JAY SNYDER AND FAIR VIEW ENERGY

43.     Frontline Power and Mr. Holmes incorporate by reference the allegations in paragraphs 1 through 42 above as if fully set forth herein.

44.     At all times that Mr. Snyder and Fair View Energy committed the tortious acts alleged herein, Frontline Power had business relationships or an expectancy of a contractual business relationship with prospective customers to pay Frontline Power to provide them with Frontline Power's energy-related services, and Mr. Snyder and Fair View Energy knew of Frontline Power's business relationships or expectancies.

45.     Mr. Snyder and Fair View Energy knowingly and intentionally interfered with Frontline Power's business relationships and expectancies of contractual business relationships with prospective customers by, among other things, spreading negative false information about Frontline Power and otherwise actively soliciting those prospective customers to not form a

14

contractual relationship with Frontline Power and to contract with Fair View Energy instead.

46.     Mr. Snyder and Fair View Energy interfered with Frontline Power's prospective contractual relationships without privilege or justification, and acted with the sole intention of damaging Frontline Power to the direct benefit of Mr. Snyder and Fair View Energy and, but for the tortious actions of Mr. Snyder and Fair View Energy, Frontline Power would have established contractual relationships with these prospective customers.

47.     As a direct and proximate result of Mr. Snyder's and Fair View Energy's intentional interference with Frontline Power's business relationships and expectancies of contractual business relationships with prospective customers, Frontline Power did not establish contractual relationships with these prospective customers and suffered other damages.

WHEREFORE, Frontline Power and Mr. Holmes pray that the Court enter judgment against Jay Snyder and Fair View Energy for tortious interference with prospective contractual relations and award Frontline Power and Mr. Holmes their damages, to be proven at trial, pre-judgment and post-judgment interest, costs, and any further relief the Court deems just.

## COUNT V – BREACH OF CONTRACT AGAINST JAY SNYDER

48.     Frontline Power and Mr. Holmes incorporate by reference the allegations in paragraphs 1 through 47 above as if fully set forth herein.

49.     Mr. Snyder entered into the Agent Agreement with Frontline Power, and that agreement was supported by full and adequate consideration.

50.     Among other obligations, the Agent Agreement barred Mr. Snyder from soliciting, directly or indirectly, Frontline Power's customers, agents, sub-agents, or other affiliates to leave Frontline Power during the period of the agency relationship and for a period of 12 months after its termination, and it prohibited Mr. Snyder from disclosing confidential

15

and proprietary information of Frontline Power and its customers.

51.    In exchange, Mr. Snyder received valuable commissions and other sums from Frontline Power through his continued agency relationship.

52.    Mr. Snyder has breached the Agent Agreement and other obligations owed to Frontline Power by engaging in the acts described above, which acts Mr. Snyder committed in bad faith and by which he intentionally sought to damage Frontline Power, solely for his own benefit and for the benefit of Fair View Energy and its co-owner(s) as well.

53.    The Agent Agreement also imposed a duty of good faith and fair dealing upon Mr. Snyder, which Mr. Snyder also breached by engaging in the acts described above.

54.    Frontline Power has suffered damages as a direct and proximate result of Mr. Snyder's breach of his obligations under the Agent Agreement, including, but not limited to, lost customers, lost revenue, loss of customer goodwill, and harm to its business reputation.

WHEREFORE, Frontline Power and Mr. Snyder pray that the Court enter judgment against Jay Snyder for breach of contract and award Frontline Power its damages, to be proven at trial, pre-judgment and post-judgment interest, costs, and any further relief the Court deems just.

## COUNT VI – BREACH OF CONTRACT AGAINST FAIR VIEW ENERGY AND JAY SNYDER

55.    Frontline Power and Mr. Holmes incorporate by reference the allegations in paragraphs 1 through 54 above as if fully set forth herein.

56.    Defendants entered into an agreement with Frontline Power that was supported by full and adequate consideration.

57.    Among other obligations, Defendants' agreement with Frontline Power obligated Fair View Energy to collect funds from sales generated by Mr. Snyder and other Frontline Power sales associates in Ohio, through a third-party broker, and transfer those

brokerage fees to Frontline Power. Frontline Power would then use those brokerage fees to pay commissions to Mr. Snyder and other sales people responsible for the initial sales.

58.     Defendants have breached their agreement with Frontline Power by, among other things, failing to transfer such brokerage fees to Frontline Power beginning in or around May of 2015, which fees totaled approximately six thousand dollars per month.

59.     This agreement also imposed a duty of good faith and fair dealing upon Defendants, which Defendants also breached by engaging in the acts described above.

60.     Frontline Power has suffered damages as a direct and proximate result of Defendants' breaches of their obligations under such agreement. For example, Frontline Power has not received the benefit of such brokerage fees since at least May of 2015, yet it has continued to pay its sales representatives commissions for the underlying sales on which the brokerage fees were based.

WHEREFORE, Frontline Power and Mr. Holmes pray that the Court enter judgment against Fair View Energy and Jay Snyder for breach of contract and award Frontline Power its damages, to be proven at trial, pre-judgment and post-judgment interest, costs, and any further relief the Court deems just.

FRONTLINE POWER AND JOHN HOLMES HEREBY DEMAND A JURY TRIAL OF ALL CLAIMS SO TRIABLE.

FRONTLINE POWER SOLUTIONS, LLC and
JOHN T. HOLMES

By Their Attorneys,

*/s/ Timothy C. Cavazza, Esq.*
Timothy C. Cavazza (#8079)
Christopher N. Dawson (#8508)
Whelan Corrente Kinder & Siket LLP
100 Westminster Street, Suite 710
Providence, Rhode Island 02903
Ph. (401) 270-4500
Fax (401) 270-3760

Dated:  September 29, 2015

00016235.DOCX

18